**1118**

ATLAS STEAMSHIP CHARTERING
CORPORATION, Plaintiff,

v.

DILLINGHAM CORPORATION and Ha-
waiian Tug & Barge Co., Ltd.,
Defendants.

No. 69 Civ. 1378.

United States District Court,
S. D. New York.

June 4, 1970.

Haight, Gardner, Poor & Havens, New York City, for plaintiff; Thomas K. Roche, Terence Gargan, New York City, of counsel.

Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, for defendants; Jerome Doyle, Nathaniel J. Bickford, New York City, of counsel.

## MEMORANDUM

TENNEY, District Judge.

By complaint dated April 3, 1969, plaintiff Atlas Steamship Chartering Corporation (hereinafter referred to as "Atlas") commenced an action against each of the above-named defendants demanding $30,000 in damages for defendants' alleged failure to pay a 3 per cent brokerage commission to plaintiff pursuant to the terms of a contract, the existence of which is vigorously disputed by defendants.

From the papers and exhibits before me, it appears that on January 27, 1969 Frank O. Garson, president of Atlas, wrote to Mr. C. Riddle, vice president in charge of marketing of Hawaiian Tug & Barge Co., Ltd., (hereinafter referred to as "Hawaiian") a wholly-owned subsidiary of co-defendant Dillingham Corporation (hereinafter referred to as "Dillingham"), inquiring whether he had a barge for sale that would meet enumerated specifications. Mr. Garson indicated that he had a "live inquiry" from an undisclosed client and therefore requested that Mr. Riddle send "full

specifications, [a] photo, and [the] lowest price for a cash deal. * * * " [1]

On February 11, 1969, Mr. Riddle responded to Mr. Garson's letter and, with considerable specificity, described a barge that Mr. Garson's customer could consider for a cash price of $1,000,000.00, delivery in Honolulu, Hawaii. Mr. Garson was informed, however, that the defendants "would have to complete some of * * * [their] commitments in order to set a release date for the * * * [barge]." [2]

On February 12, Mr. Riddle again wrote to Mr. Garson to confirm a telephone conversation between them the same day. In this letter, defendants again informed plaintiff that the commitments for the barge were currently uncompleted and that they were waiting for a response from the present charterers, as to "whether they intend[ed] to go further with the charter or * * * [intended to] terminate". [3]

On February 13, Garson telegraphed Riddle confirming the same telephone conversation. This telegram contained the first reference to the disputed 3 per cent commission allegedly owed defendants by the plaintiff herein, and indicated that the commission was to be paid when the deal was consummated, and that the transaction was subject to survey and drydocking. [4]

Four days later, Garson again wrote Riddle setting forth the entire February 13 telegram which, as previously indicated, contained the first reference to the brokerage commission. In the last paragraph of the letter Garson admitted that he had not yet received confirmation of the agreement and that he expected to hear from the defendants as to when he could "expect delivery in the event the deal * * * [was] consummated." [5]

Later the same day, Riddle telegraphed Garson that "Charterers extending contract therefore * * * [barge] not available for sale at this time". [6]

On February 19, in response to another telegram from Garson, Riddle reemphasized the previous understanding that any sale arrangement was to be subject to the existing charterers' decision as to whether or not they intended to continue the charter. [7]

In a final attempt to keep the embers glowing, Garson again wired Riddle inquiring as to the date the new charter expired and whether the defendants would sell the barge subject to the renewed charter party. [8] Riddle responded on February 25, informing Garson that no such arrangements could be made. [9]

Plaintiff, relying on the above-cited events and communications, sues for a brokerage commission claiming that: 1) Dillingham offered to sell a specific barge for $1,000,000.00; 2) that acting as a broker in the transaction it produced a buyer; 3) that defendants agreed to pay plaintiff a commission of 3 per cent of the barge's selling price; and 4) that Dillingham refused to consummate the sale arranged by Atlas. Alternatively, plaintiff sues in *quantum meruit* to recover the reasonable value of the services that it rendered.

Defendants, urging various grounds in support of their motion, move pursuant to Fed.R.Civ.P. 56 for summary judgment dismissing plaintiff's action.

1. Def. Exh. 1, attached to Notice of Motion (dated April 9, 1970).

2. Def. Exh. 2, attached to Notice of Motion (dated April 9, 1970).

3. Def. Exh. 3, attached to Notice of Motion (dated April 9, 1970).

4. Def. Exh. 4, attached to Notice of Motion (dated April 9, 1970).

5. Def. Exh. 6, attached to Notice of Motion (dated April 9, 1970).

6. Def. Exh. 5, attached to Notice of Motion (dated April 9, 1970).

7. Def. Exh. 8, attached to Notice of Motion (dated April 9, 1970).

8. Def. Exh. 9, attached to Notice of Motion (dated April 9, 1970).

9. Def. Exh. 11, attached to Notice of Motion (dated April 9, 1970).

■ The second, third and fourth grounds proffered by defendants in support of this motion raise genuine issues of fact concerning the existence of the agreement and the terms, conditions and documents relating thereto.[10] These issues of fact must, of course, await a plenary trial for resolution.

■ Defendants' first contention, that Section 5–701 of the General Obligations Law, McKinney's Consol. Laws, c. 24–A, precludes recovery by plaintiff, presents a question of law which may properly be decided on a motion for summary judgment.

Section 5–701(10), in pertinent part, provides that:

"Every agreement * * * is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, * * * if such agreement * * * [i]s a contract to pay compensation for services rendered * * * in negotiating the purchase [or] sale * * * of a business opportunity, business * * * inventory, fixtures or an interest therein * * *."

It should initially be noted that irrespective of whether any of the above summarized and cited communications singly or collectively constitute a contract to sell a barge, there exists no written agreement subscribed by either defendant to pay a broker's commission to the plaintiff herein. That is, a brokerage commission is not mentioned in any communication sent by the defendant nor is there any indication that an agreement for such commission was ever reached.

■ Thus, the neatly-framed legal issue facing this Court is whether the above-cited subsection of the New York Statute of Frauds, which requires that "a contract to pay compensation for services rendered * * * in negotiating the purchase [or] sale * * * of a business opportunity, business * * * inventory, fixtures or an interest therein", be in writing is applicable to a brokerage contract for the sale of one of at least twenty barges owned by a large corporation and its subsidiaries.[11]

■ The legislative history to subdivision 10 of Section 5–701 makes it abundantly clear that contracts to compensate business brokers require a writing signed by the party to be charged, 1949 Leg.Doc.No. 65(G), 1949 Report, Recommendations and Studies, and that contracts for which a writing is required include contracts for the compensation of a business broker who acts as a finder, originator or introducer. 1964 Leg.Doc.

---

10. More specifically, defendants urge that, based upon the above cited and summarized documents, the parties never reached an agreement concerning the sale of the barge, and if any agreement was reached it never became binding on defendants since it was subject to a condition which never occurred. Whether a contract exists, and, if so, whether it is subject to any conditions, present issues of fact properly determined by a jury at trial.

In addition, defendants contend that since certain material terms were not agreed upon by the parties, as a matter of law no contract could have come into being. The materiality of omitted terms of an alleged agreement is also a question of fact.

Finally, it is urged that the clear meaning of the documents before the Court negate the existence of any "agreement". As indicated *infra*, since the contract pleaded by plaintiff does not require a writing, other matters may be considered in determining whether the alleged contract exists. Of course, the "existence" of the pleaded contract will then present issues of fact to be resolved at trial.

11. In response to two questions posed by the Court, defendants have submitted a telegram dated May 26, 1970 which reveals that during the first quarter of 1969 Dillingham and its subsidiaries collectively owned twenty barges and that had any sale been consummated, it would have been an isolated instance since these corporations were not in the business of selling barges. By letter dated May 27, 1970, plaintiff urges that defendant Dillingham and its subsidiaries owned more than twenty barges. It is therefore undisputed that Dillingham and its subsidiaries owned at least twenty barges.

No. 65(F), 1964 Report, Recommendations and Studies.

The courts of New York have exercised great care to interpret the statute in accordance with the confessed intent of the Legislature. Intercontinental Planning, Limited v. Daystrom, Inc., 24 N.Y.2d 372, 300 N.Y.S.2d 817, 248 N.E. 2d 576 (1969); National Performing Arts, Inc. v. Guettel, 46 Misc.2d 411, 259 N.Y.S.2d 527 (Sup.Ct.1965); Sorge v. Nott, 34 Misc.2d 545, 226 N.Y.S.2d 57 (Sup.Ct.1962).

After careful consideration of the statute and its history, as well as relevant authority, the Court is convinced that the contract pleaded by the plaintiff herein is not one that requires a writing.

I find the opinion of Judge Greenfield in Lounsbury v. Bethlehem Steel Corp., 53 Misc.2d 151, 277 N.Y.S.2d 700 (Civ.Ct.1967), dispositive of the issue. As indicated in *Lounsbury,* if the statute were literally construed it might be deemed to cover each individual sale of any part of a business or its inventory, as well as every fixture owned by that business. I, to, am not convinced that the Legislature intended that this statute bar recovery by a salesman on an oral contract to sell the products or assets of a business. This, no doubt, would be the result of a literal construction of the statute.

When the statute was enacted, the Legislature apparently intended to eliminate unsupported, spurious commission claims for negotiating the sale of a business or for negotiating the sale of all or a substantial portion of the assets of that business. The thrust of the statute was, therefore, aimed at eliminating oral commission claims submitted by alleged "business finders" for services rendered in the sale of "a going business or a business opportunity." Lounsbury v. Bethlehem Steel Corp., *supra,* 277 N.Y.S. 2d at 703.

Admittedly, the words "inventory, fixtures or an interest therein" lend support to a more literal interpretation of the statute, but I am convinced that these words merely describe the components of a going business and that there was no intention that the statute "cover fractionalized segments of such elements apart from the sale of a going business or a substantial interest therein". Lounsbury v. Bethlehem Steel Corp., *supra,* 277 N.Y.S.2d at 704.

In conclusion, I hold that the sale of an individual asset, whether out of inventory or not, does not come within the purview of the statute unless, of course, this asset is something akin to a business or business opportunity as discussed above. This, I believe, is in accord with the manifest intent of the statute to encompass situations involving the sale of an entire business or a substantial part thereof—that is, "a sale of assets constituting a going business or capable of forming the nucleus of a going business —an organic entity and not a dismembered component". Lounsbury v. Bethlehem Steel Corp., *supra,* 277 N.Y.S.2d at 705.

Accordingly, and for the foregoing reasons, defendants' motion for summary judgment is in all respects denied.

So ordered.