**Herbert L. HUTNER, Plaintiff,**

v.

**David J. GREENE, David J. Greene & Company, Inc. and Jerome L. Greene, Defendants.**

**No. 81 Civ. 4086 (RLC).**

United States District Court,
S.D. New York.

July 29, 1983.

---

Finley, Kumble, Wagner, Heine, Underberg & Casey, New York City, for plaintiff; Jerome Kowalski, Jeffrey P. Meyer, New York City, of counsel.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for defendants; Gilbert S. Edelson, Nadia C. Adler, New York City, of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Herbert Hutner ("Hutner") brings this action against David Greene ("D. Greene"), David Greene & Co. ("Greene & Co.") and Jerome Greene ("J. Greene"), to recover a finder's fee allegedly due him under an oral contract with D. Greene. D. Greene is a New York resident and a general partner in Greene & Co., a New York limited partnership. J. Greene, who is not related to D. Greene, is an attorney practicing law in New York City. Hutner is a California resident who acts as a finder for individuals and/or corporations interested in the sale or purchase of securities. He is also an attorney licensed to practice law in New York.

On January 5, 1979, Hutner met with D. Greene and David Brown ("Brown"), the General Counsel to City Investing Corporation ("City Investing"), in Palm Springs, California to discuss a possible sale of C.I. Realty Investors ("C.I. Realty") stock from D. Greene and Greene & Co. to City Investing. D. Greene and Greene & Co.'s Statement Under Local Rule 3(g) at ¶ 14.[1] D. Greene and Greene & Co. have conceded for the purpose of this motion only, that a possible sale of C.I. Realty shares to D.

---

1. Until July 1979, City Investing owned shares and controlled the operations of C.I. Realty through City Investing's subsidiary, C.I. Planning Corporation. Greene and Greene & Co.'s Statement Under Local Rule 3(g) at ¶ 11.

Greene and/or to Greene & Co. was also discussed. *Id.*

During the meeting, Hutner contends that he informed D. Greene that he would expect to receive a normal finder's fee in the event that a sale or purchase was consummated with D. Greene and City Investing or anyone that D. Greene represented. To that D. Greene allegedly replied; "We will take care of you." Hutner's Deposition at 152. Defendants have conceded Hutner's version of the facts for the purpose of this motion only. D. Greene and Greene & Co.'s Statement Under Local Rule 3(g) at ¶ 15.

Ultimately, the meeting proved fruitless, with neither side making an acceptable offer. No further communication ensued between Brown and D. Greene; however, Hutner continued to relay offers, counteroffers and rejections between the parties. Affidavit of Hutner at ¶ 4. Brown and D. Greene never reached any agreement for the sale or purchase of C.I. Realty shares. Brief of D. Greene and Greene & Co. at 12.

Later that month, J. Greene called George Scharffenberger ("Scharffenberger"), the Chief Executive Officer of City Investing, to inquire if the latter was interested in selling the C.I. Realty shares of City Investing. Affidavit of J. Greene at ¶ 6. Scharffenberger replied that he was not interested. *Id.* The parties dispute whether, at that time, J. Greene was aware of the status of the negotiations between D. Greene and Brown. *Id.* at ¶ 4. Eventually, Scharffenberger changed his mind and on June 3, 1979, J. Greene told D. Greene that he was engaged in negotiations with Scharffenberger for the purchase of City Investor's C.I. Realty stock. D. Greene and Greene & Co.'s Statement Under Local Rule 3(g) at ¶ 33. At that point, D. Greene volunteered to obtain Scharffenberger's weekend number from Hutner. *Id.*

Subsequently, Scharffenberger and J. Greene agreed that City Investing would sell its 533,870 C.I. Realty Shares for $24.50 a share. *Id.* at ¶ 34. J. Greene then proceeded to search for buyers for the stock, *id.*

at ¶ 35, and approached D. Greene and Alan Greene, the managing partner of Greene & Co., to inquire if either D. Greene or Greene & Co. wished to acquire some of the C.I. Realty stock. *Id.* at ¶ 36. Both declined, citing in part their belief that the price was too high and that an impending proxy contest would succeed. *Id.* Ultimately, J. Greene sold 325,000 of the shares to Great American Insurance Company, and 85,000 shares to the Studebaker-Worthington Pension Fund. *Id.* at ¶ 37. Most of the remaining stock was sold to Frederick Stein, Simon Scheuer, Peter Sharp and Hambros Bank, Ltd. What these parties did not buy, Greene kept for himself. *Id.*

Hutner admits that other than introducing D. Greene to Brown and furnishing the former with Scharffenberger's home number, he was not involved in the negotiations which ultimately culminated in the sale of the stock. Affidavit of Hutner at ¶ 4. He nonetheless seeks a finder's fee from D. Greene and J. Greene pursuant to the alleged oral agreement with D. Greene because he claims that:

> As a result of [his] introduction of D. Greene to officers of City Investing and with the information regarding the status and the specific terms of the negotiations that J. Greene obtained through his [Hutner's] frequent communications with D. Greene and Alan Greene, J. Greene·found several institutions and individuals that were willing to, and did in fact, purchase City Investing's 533,870 shares of C.I. Realty for $24.50 a share. Hutner's Statement Under Local Rule 3(g) at ¶ 11.

Hutner thus contends that by introducing D. Greene to Brown and by giving D. Greene Scharffenberger's telephone number, he was the procuring cause of the eventual sale by City Investing of its shares of C.I. Realty to J. Greene and others. *Id.* at ¶ 12. Hutner argues, moreover, that D. Greene was acting on behalf of the eventual buying group when he met with Brown in Palm Springs. Affidavit of J. Greene, Exhibit A.

Defendants [2] have filed separate motions for summary judgment pursuant to Rule 56, F.R.Civ.P. D. Greene and Greene & Co. concede the existence of the oral contract between D. Greene and Hutner for the purpose of this motion only, but they contend nevertheless that: (1) Hutner's claims are barred by the New York Statute of Frauds; (2) even if California law were to be applied, as plaintiff urges, the claims are precluded by that state's licensing laws; (3) the supposed oral contract is unenforceable because of the vagueness of the price terms, because Hutner was not the procuring cause of the sale of the C.I. Realty stock, and because the contract by its terms did not include J. Greene or any of the purchasing group. J. Greene has moved for summary judgment on the grounds that he did not authorize D. Greene to negotiate a contract for a finder's fee with Hutner and that Hutner was not in any way responsible for his or the other parties' purchase of the C.I. Realty shares.

The action is based on diversity jurisdiction, accordingly, the threshold question to be determined is which state's law will be applied. *Erie v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). To decide that question we are bound by the choice of law rules of the forum state. *Loebig v. Larucci,* 572 F.2d 81, 84 (2d Cir.1978), *citing, Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). On issues of substantive law, New York courts employ the "paramount interest" test which gives "controlling effect to the law of the jurisdiction which has the greatest concern with, or interest in, the specific issue raised in the litigation..." *Neumeier v. Kuehner,* 31 N.Y.2d 121, 335 N.Y.S.2d 64, 69, 286 N.E.2d 454, 457 (1972); *see also, Intercontinental Planning v. Daystrom,* 24 N.Y.2d 372, 383, 300 N.Y.S.2d 817, 825, 248 N.E.2d 576, 582 (1969).

The task of the court is first to ascertain what the relevant legal issues are and then to determine, if more than one state is involved, which state's legitimate interests are most crucially implicated. *Neumeier, supra,* 335 N.Y.S.2d at 69, 286 N.E.2d at 457; *Intercontinental, supra,* 300 N.Y.S.2d at 825, 248 N.E.2d at 582; R. Leflar, *American Conflicts Law,* 221 (3rd ed.).

Defendants have identified two issues, the so called statute of frauds issue, that is whether the oral contract is barred by the New York Statute of Frauds, and the licensing issue, i.e., whether Hutner's activities in negotiating with the parties, and relaying offers and counter-offers, were prohibited under California law because he is an unlicensed broker. They contend that New York law should control the first point because New York has the greater interest in protecting its residents against unfounded claims for broker's fees. They also argue that California law should control the licensing issue since California has the most cogent interest in regulating the activities of its citizens. Hutner asserts that California law should be applied to the entire transaction since he claims that California is most concerned with protecting the expectations of its citizens in business matters of this type.

In arguing for the application of New York law to one issue and California law to the other, defendants are advocating the use of "depecage," a doctrine which permits different issues in a single case arising from a single set of facts to be decided according to the law of different jurisdictions. Leflar, *supra, American Conflicts Law* at 221. Defendants point to *Babcock v. Jackson,* 12 N.Y.2d 473, 240 N.Y.S.2d 743, 750–52, 191 N.E.2d 279, 284–85 (1963), in support of this position. *Babcock* involved a suit by a New York guest against a New York driver for injuries sustained in an automobile accident in Ontario. The court held that New York had the paramount interest on the issue of the driver's liability to the guest for the latter's injuries. However, it also held that if the issue had been the driver's failure to observe a general standard of road conduct

---

2. Unless otherwise noted, the use of the term "defendants" throughout this opinion will hereafter refer to David Greene and Greene & Co.

prescribed by Ontario, Ontario would have had the supreme interest.

■ *Babcock* involved two distinct issues, thus arguably necessitating depecage. Here, however, there is really only one issue—whether there was an oral contract between D. Greene and Hutner and the rights and liabilities thereunder. Defendants attempt to identify Hutner's activities as implicating California's law requiring the licensing of real estate brokers is not persuasive. Hutner's actions, however, cannot be treated as a separate issue because Hutner performed those services solely because he thought that he was acting under an oral contract with D. Greene. These actions do not form the basis of a separate contract or of a separate cause of action. Rather, they are merely part of the statute of frauds issue.

■ Having found only one relevant issue, it becomes readily apparent that there are more substantial contacts with New York than with California, and that New York also has a greater interest in the action than does California.

The only contacts with California are Hutner's residence there and the Palm Springs meeting between Hutner, D. Greene and Brown. Hutner's Brief in Opposition to the Motion at 6. On the other hand, defendant D. Greene is a New York resident, Greene and Co. is a New York limited partnership and J. Greene is a New York resident and a practicing attorney in New York. Defendant D. Greene and Greene & Co.'s Brief in Support of its Motion at 3–4. More significantly, the terms of the sale of the shares were negotiated in New York City; the stock purchase agreement was drafted and executed in New York; the sales and the purchases took place in New York and the stock purchase agreements provide that they will be governed by New York law. *Id.* at 17.

Similarly, the policies embodied in the New York Statute of Frauds are more compelling than those found in the California Statute of Frauds. The New York legislature enacted a writing requirement to prevent unfounded claims for brokers' fees and to prevent employers who have hired a broker from attempting to escape liability for payment. 1949 Report of N.Y.Law Rev. Comm. [N.Y.Legis.Doc., 1949, No. 65(G)] at 615. The New York Court of Appeals summarized the state policy as "intended to protect not only [the state's] own residents, but also those who come into New York and take advantage of our position as an international clearing house and market place... This encourages the use of New York brokers and finders by foreign principals and contributes to the economic development of our State..." *Intercontinental Planning Ltd., supra,* 300 N.Y.S.2d at 826–27, 248 N.E.2d at 583–84.

The California Statute of Frauds which does not require that finder's fees be in writing, has as its purpose; "upholding the reasonable expectations of its residents who are parties to agreements that would be valid and enforceable absent any Frauds restriction." *Denny v. American Tobacco Co.,* 308 F.Supp. 219, 223–24 (N.D.Cal.1970). However, as that California court noted when confronted with the analogous situation of having to choose between applying the New York Statute of Frauds or the more lenient California statute to an oral broker's agreement: "California's interest in protecting the reasonable expectations of its residents is ... much less apparent [than New York's interest]. Whether it be said that there is no 'true conflict' or simply that California's legislature did not intend its policy to reach cases like this, the effect is the same, and New York's law is applicable." *Id.* at 224.[3]

Further, Hutner, being an experienced businessman, had to expect that New York law would be controlling when dealing with the sale of stock to New York residents in a business primarily centered in New York.

---

**3.** The New York courts have likewise opted for the New York Statute of Frauds when faced with another state's less severe statute of frauds. *See, Pallavicini v. International Telephone & Telegraph Corp.,* 41 A.D.2d 66, 341 N.Y.S.2d 281 (1st Dep't 1973), *aff'd,* 34 N.Y.2d 913, 359 N.Y.S.2d 290, 316 N.E.2d 722 (1974).

The fortuity that the initial meeting between the parties occurred in California is not sufficient to outweigh the other more substantial contacts with New York. Hence, New York law will control the issues in this case.

■ Defendants' assertion that the oral contract is barred by the New York Statute of Frauds may be disposed of quickly. Section 5–701 subd. a(10) of the New York General Obligations law provides in part:

Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement promise or undertaking:

10. Is a contract to pay compensation for services rendered in negotiating a loan, or in negotiating the purchase, sale, exchange, renting or leasing of any real estate or interest therein, or of a business opportunity, business, its good will, inventory, fixtures or an interest therein, including a majority of the voting stock interest in a corporation and including the creating of a partnership interest. "Negotiating" includes procuring an introduction to a party to the transaction or assisting in the negotiation or consummation of a transaction. N.Y.Gen. Oblig.Law § 5–701, subd. a(10) (McKinney 1978).

That section also contains an exception to the writing requirement for attorneys, to wit: "This provision . . . . shall not apply to a contract to pay compensation to an auctioneer, an attorney at law, or a duly licensed real estate broker . . ." *Id.* Hutner asserts that as an attorney licensed to practice law in New York, he is entitled to seek refuge in that exception. Because Hutner admittedly has not practiced law in almost fifty years, Deposition of Herbert Hutner at 6, defendants argue that he should not be treated as an "attorney at law" for the purpose of the statute. The case law is to the contrary. The New York courts have uniformly held that an attorney means just that—someone licensed to practice law in New York. They have not drawn any arti-

ficial distinctions between practicing and non-practicing attorneys, nor have they carved out requirements for a minimum length of active practice to qualify for the exception. *Rever v. Kayser-Roth,* 26 N.Y.2d 652, 308 N.Y.S.2d 384, 256 N.E.2d 540 (1970); *Seligman v. Exquisite Form Industries,* 33 A.D.2d 550, 304 N.Y.S.2d 567, 568 (1st Dep't 1969); *Harris v. Sobel,* 31 A.D.2d 529, 295 N.Y.S.2d 181, 182 (1st Dep't 1968).

Indeed, in the most recent Court of Appeals case found by this court, it was held that an attorney who had arranged for the sale and purchase of stock by two corporations and who had not been acting as an attorney when arranging the transaction, and who in fact, the parties did not even know was an attorney at the time, was nonetheless privileged to seek shelter in the "attorney" exception to Section 5–701 subd. a(10). *Rever, supra,* 308 N.Y.S.2d at 384, 256 N.E.2d at 540. The opinion did not indicate whether the plaintiff was actively in the practice of law at that time, nor whether he had ever practiced law. *Id.* Accordingly, as an attorney licensed to practice in New York, Hutner is entitled to the exemption provided for in subdivision a(10) of Section 5–701. N.Y.Gen.Oblig.Law § 5–701 subd. a(10) (McKinney 1978).

■ Defendants next contend that Hutner was not the procuring cause of the stock transaction involving J. Greene and City Investing. This is a disputed factual issue and thus is not susceptible to a motion for summary judgment.[3] *See,* Hutner's Statement Under Local Rule 3(g) at ¶¶ 11–12; D. Greene and Greene & Co.'s Statement Under Local Rule 3(g) at ¶¶ 23–24; J. Greene's Statement Under Local Rule 3(g) at ¶ 1.

■ Their argument regarding the indefiniteness of the price term in the contract is less easily resolved. The undisputed terms of the oral contract are as follows:

If D. Greene and other investors purchased from City Investing its C.I. Realty shares, or if City Investing bought the C.I. Realty shares of D. Greene and other

investors, then D. Greene and the other investors would pay [Hutner] a finders' fee. Greene and Greene & Co.'s Statement Under Local Rule 3(g) at ¶ 15(c); Hutner's Deposition at 152.

The parties do not dispute that they failed to reach a specific agreement as to Hutner's fee. Affidavit of Hutner at ¶ 6; Deposition of Hutner at 152; Brief of D. Greene and Greene & Co. at 47. Plaintiff attempts to manufacture a factual issue by claiming that it was his "understanding" that the Lehman formula[4] was to be used. However, this argument fails in light of his affidavit and deposition testimony which clearly show that no agreement for his compensation under the contract was ever made.

Hutner stated in that regard:

At the Palm Springs meeting on or about January 5, 1979, D. Greene stated to me that in the event that a transaction was consummated with respect to the C.I. Realty Investors common stock as a result of my introduction of D. Greene to City Investing Company, 'we'll take care of you.' Based upon my experience in the investing community, *I understood this to mean* that I would be compensated in accordance with the ... Lehman formula ... When D. Greene stated to me that 'we'll take care of you,' *I did not believe it necessary to ask for any further clarification of the compensation arrangement* ... Affidavit of Hutner at ¶ 6. (Emphasis added).

When deposed in reference to the Palm Springs meeting, Hutner testified:

I thereupon turned to David Greene, and I said, 'If a deal is made of any kind here,' pretty much repeating the words of David Brown, 'purchase, sale or any other kind of deal between these two parties or the parties that you,' David Greene, 'represent, in addition to yourself, I shall expect to receive,' I think I used the term *'a normal fee for such services.'*

And David Greene answered, his answer was, *'We will take care of you.'* Since, in all my previous dealings with people in Wall Street where a man's word is his bond, *I just took it for granted that that was all that was necessary to be said.* Hutner's Deposition at 152. (Emphasis added).

It is well established that for an agreement to be binding it "must be sufficiently definite to enable a court to give it an exact meaning." *Trimmer v. Van Bomel,* 107 Misc.2d 201, 434 N.Y.S.2d 82, 86 (Sup.Ct. 1980). The omission of a material element renders the contract unenforceable as there has been no "meeting of the minds." *Id.; Neiss v. Franze,* 101 Misc.2d 871, 422 N.Y. S.2d 345, 347 (Sup.Ct.1979). The price term has been deemed such a material element. *Ansorge v. Kane,* 244 N.Y. 395, 398, 155 N.E. 683, 684 (1927).

Hutner's depositions and affidavit demonstrate that the extent of the agreement between Hutner and Greene for Hutner's fee was simply that Hutner "would be taken care of." This is the same arrangement which the court in *Trimmer, supra,* found unacceptable. In that case the former companion of an elderly widow alleged that the widow had orally promised to provide for him for the remainder of his life. In granting summary judgment for the widow, the court stated;

"No amount being specified, no time having been set forth, no mechanics for the payments having been spelled out.... what we have, at best, is some vague but legally unenforceable reassurance that *plaintiff 'would be taken care of.'* " (Emphasis added)

*Trimmer, supra,* 434 N.Y.S.2d 82, 88; *see also, Neiss, supra* 422 N.Y.S.2d at 346 [agreement that plaintiffs would take out a 'conventional mortgage' was unenforceable where the terms of the mortgage and the interest rate were not also set out.] I find the instant case indistinguishable from

---

**4.** The Lehman formula provides for compensation to a finder on a 5–4–3–2–1 basis, i.e. 5% on the first $1,000,000 of the transaction, 4% on the second $1,000,000, 3% on the third $1,000,000, 2% on the fourth $1,000,000 and 1% on each $1,000,000 thereafter. Affidavit of Walter P. Miller at ¶ 12.

*Trimmer.* The parties did not agree upon a specific price term, and as there is no dispute as to that fact, I must find the contract unenforceable. Accordingly, defendants' motion for summary judgment is granted.[5]

IT IS SO ORDERED.

---

5. It is unnecessary to consider defendants' final argument that the contract by its terms did not include J. Greene or the ultimate purchasers since I find the contract unenforceable. As the contract is unenforceable, J. Greene's motion for summary judgment is also granted.